# EXHIBIT 1

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.



**Form PA**
For a Work of Performing Arts
UNITED STATES COPYRIGHT OFFICE

REG   **PAu 2 — 991 — 325**

EFFECTIVE DATE OF REGISTRATION

10 - 14 - 05

Month    Day    Year



**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

**TITLE OF THIS WORK ▼**

HoundDog

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**NATURE OF THIS WORK ▼** See instructions

Motion Picture

**2**

**a**   **NAME OF AUTHOR ▼**

Deborah Kampmeier

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼
1964

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of   USA
{ Domiciled in _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☑ No
Pseudonymous?   ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

Screenplay - original

**b**   **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of _____
{ Domiciled in _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**   **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of _____
{ Domiciled in _____

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**a**   **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
1996   Year

**b**   **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month _____ Day _____ Year _____
Nation

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Deborah Kampmeier
300 Ferdon Avenue
Piermont, NY 10968

See instructions before completing this space.

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
OCT 14 2005
ONE DEPOSIT RECEIVED
OCT 14 2005
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

2

| EXAMINED BY | JK | FORM PA |
|---|---|---|
| CHECKED BY | | |

| | CORRESPONDENCE | | FOR COPYRIGHT OFFICE USE ONLY |
|---|---|---|---|
| ☐ | Yes | | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☐No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C.

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼                Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**6**

See instructions before completing this space.

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼                                                        Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Deborah Kampmeier
300 Ferdon Avenue
Piermont, NY 10968

**b**

Area code and daytime telephone number  ( 845 ) 680-0395              Fax number  ( 845 ) 680-9409

Email  dkfilms@aol.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive rights
☐ authorized agent of

**8**

Name of author or other copyright claimant, or owner of exclusive rights(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

DEBORAH J. KAMPMEIER                          Date  9/28/2005

Handwritten signature (X) ▼

☞  X  Kampmeier

| Certificate will be mailed in window envelope to this address: | Name ▼ DEBORAH KAMPMEIER | • Complete all necessary spaces • Sign your application in space 8 |
|---|---|---|
| | Number/Street/Apt ▼ 300 FERDON AVENUE | SEND ALL 3 ELEMENTS IN THE SAME PACKAGE: 1. Application form 2. Nonrefundable filing fee in check or money order payable to Register of Copyrights 3. Deposit material |
| | City/State/ZIP ▼ PIERMONT, NY 10968 | MAIL TO: Library of Congress Copyright Office 101 Independence Avenue, S.E. Washington, D.C. 20559-6000 |

**9**

# EXHIBIT 2



# Certificate of Recordation

This is to certify that the attached document was recorded
in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

| DATE OF RECORDATION | |
|---|---|
| 9May06 | |
| VOLUME | DOC. NO. |
| 3538 | 63 |
| VOLUME | DOC. NO. |

*Marybeth Peters*

Register of Copyrights and
Associate Librarian for Copyright Services

C-761 · JANUARY 2004 — 4,000

# Document Cover Sheet
UNITED STATES COPYRIGHT OFFICE

Copyright Office fees are subject to change.
For current fees check the Copyright Office website at
www.copyright.gov or yright Office at ___

**For Recordation of Documents**

Volume **3538**   Document **63**

Volume _____   Document _____

Date of Recordation **MAY 0 9 2006**

150046758

MAY 1 0 2006

DOCUMENT SECTION

Funds Received _____

**DO NOT WRITE ABOVE THIS LINE · SEE INSTRUCTIONS ON REVERSE**

To the Register of Copyrights: *Please record the accompanying original document or properly certified copy thereof.*

**1** First party name given in the document   **Deborah Kampmeier**
(IMPORTANT: *Please read instruction for this and other spaces.*)

**2** First title given in the document   **Hounddog**

**3** Total number of titles in the document   **One**

**4** Amount of fee calculated   **$80 #1114**

**5** Fee enclosed
☐ Check  ☐ Money order
☐ Fee authorized to be charged to Copyright Office Deposit Account

Deposit Account number _____

Deposit Account name _____

**6** Completeness of document   ☑ Document is complete by its own terms    ☐ Document is not complete. Record "as is."

**IMPORTANT NOTE:** *A request to record a document "as is" under 37 CFR §201.4(c)(2) is an assertion that: (a) the attachment is completely unavailable for recordation; (b) the attachment is not essential to the identification of the subject matter of the document; and (c) it would be impossible or wholly impracticable to have the parties to the document sign or initial a deletion of the reference to the attachment.*

**7** Certification of Photocopied Document   Complete this certification if a photocopy of the original signed document is substituted for a document bearing the actual original signature.
**NOTE:** *This space may not be used for documents that require an official certification.*

I declare under penalty of perjury that the accompanying document is a true and correct copy of the original document.

Signature _____   Date **May 8, 2006**

Duly authorized agent of   **Hounddog Productions LLC**

**8** Return to:   Name   **Emerson E. Bruns**

Number/Street **1790 Broadway, 20th Floor** _____ Apt/Suite _____

City **New York** _____ State **NY** _____ Zip **10019**

Phone number **(212) 826-1054** _____ Fax number **(212) 832-2969**

Email **ebrunslaw@aol.com**

SEND TO: *Library of Congress, Copyright Office, Documents Recordation Section, LM-462, 101 Independence Avenue SE, Washington, DC 20559-6000*
INCLUDE ALL THESE TOGETHER: (1) Two copies of this form; (2) payment from a Deposit Account or by check/money order payable to Register of Copyrights; and (3) your document.

DOCUMENT COVER SHEET   PRINT REV: 01/2005—60,000   WEB REV: 01/2005   Printed on recycled paper          U.S. Government Printing Office: 2004-310-462/60,098

V3538 D063

V3538 D063   Page 1

## ASSIGNMENT

Deborah Kampmeier ("Assignor"), for value received, and in accordance with and subject to the terms of the Literary Purchase Agreement ("Purchase Agreement") dated as of May 1, 2006 by and between Assignor and Hounddog Productions LLC ("Assignee") to which reference is made for further particulars, has granted to Assignee all right, title and interest in and to that certain published literary work identified herein as "Hounddog" written and controlled by Assignor, and registered for copyright in the United States Copyright Office on October 14, 2005 under Entry No. PAu-2-991-325 (which together with the titles, contents, and characters and other versions thereof, are hereinafter collectively called the "Work"), for the entire universe, in perpetuity, which rights include, but are not limited to, all motion picture, television, televised motion picture and allied rights in and to the Work, in any and all languages and versions, including, without limitation, remake, sequel (including "prequel"), pay, cable and subscription television rights (including the right to telecast a production based on the Work on a "pay-per-view" basis), all rights respecting video cassettes, tapes and discs for home use and otherwise, and all other rights of any kind by any and all means, methods, processes and devised), including all copyrights, renewals and extensions thereof and all rights under copyright therein and thereto (the "Rights"). Assignee forthwith owns and is vested with and hereby granted all of such Rights, including all copyrights therein and thereto. The Rights granted to Assignee hereunder include but are not limited to the right to do any acts or things necessary to protect the rights granted hereunder, including the copyright, and to institute any actions for such purpose in the name(s) of Assignee, Assignor or any of them.

This Assignment is subject to the terms and conditions of the Purchase Agreement and in the event of any conflict between the provisions of this instrument and the Purchase Agreement, the provisions of the Purchase Agreement shall control.

Dated as of: May 1, 2006

_DEBORAH KAMPMEIER_

COUNTY OF _ay_

CITY OF _NY_                                   ss:

On _5/1/06_ before me DEBORAH KAMPMEIER personally appeared and is personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Notary's Signature

EMERSON BRUNS
Notary Public, State of New York
No. 02BR5085959
Qualified in New York County
Commission Expires _7/22/09_

# EXHIBIT 3



*"A Production Finance and Services Company"*

July 5, 2006

**"HOUNDDOG"**
Starring
Dakota Fanning
&
Robin Wright Penn

**Executive Producer Deal Memo**

Dear Deborah:

As per our discussions with your producer, Lawrence Robins, The Motion Picture Group, Inc. is prepared to finance $1.5mm cash flowed over the next 4 weeks according to the cash flow schedule, which shall provide for $350,000 on July 6 at 9 am and $500,000 July 10th, or as defined by the new budget approved by TMPG and Deborah Kampmeier as per Guild approvals, for the film HOUNDDOG, plus any additional amount needed for the pictures completion will be approved by TMPG, for this EP finance service we will receive:

-First position Money out plus 10%
-Presentation credit for TMPG and Panaroma Pictures in Association with Full Moon Films and Jen Gatien Productions
-3 EP credits on screen and in all paid ads
-1Producer credit for Lawrence Robins on screen and in all paid ads
-5% of 1.5mm paid out to Lawrence Robins as producers fee over the next 4 weeks.
-25% backend TMPG
-TMPG has control over the Foreign and Domestic Sale of the film, with allowing for meaningful consultation with Dakota Fanning and mutual approval by Deborah Kampmeier, not to unreasonably withheld.
-TMPG will qualify the film for Academy Award consideration.
-TMPG will get a minimum $300k-$400k North Carolina tax credit toward our investment, with good faith efforts to close in the next 30- 60 days to receive and monetize, according to the rules and regulations of the North Carolina Tax Code.
-Production confirms that the other investors or liens will subordinate their position to TMPG
-Production can not financially bind movie or add additional producer credits without TMPG permission
-This deal memo will supersede all other written and verbal agreements
-TMPG will put a completion bond in force at 3% of the budget.
-Production will serve a default notice verbally and in writing to Hand Picked Films upon execution of this agreement

8157 Mulholland Terrace, Los Angeles, CA 90046
Tel 310.492.5560 ▪ Fax 310.861.5136
www.themotionpicturegroup.com ▪ info@themotionpicturegroup.com



*"A Production Finance and Services Company"*

**\*Pay out Schedule is as follows to:**
- 1.5M in first position with 10% interest on principle to TMPG
- Dakota's deferment of $750,000
- Investors initial 2.2M returned at 120% (equals 2.640,000
- David Morse /Robin Wright-Penn deferment of $150,000 each (total $150k to300K)

**\*Then back end distribution of ownership of film paid out pari passu**
26% to Rebecca (first investor @ rate of 100K per point)
25% to Dakota
12% to cast (2-4 points each)
12% to producers/directors
25% to The Motion Picture Group

**\*Credits:**
Producers: Jen Gatien, Lawrence Robins, Raye Dowell , Deborah Kampmeier
EP: Henri Kessler, Scott Franklin, Pliny Porter, Robin Wright Penn, Rebecca Cleary, Stacey Bakula
Associate Producer: Chris Hanley
Co Producers: Terry Leonard, Kelly Tenney            *to be negotiated*

Please confirm that the production can approve this deal. Once agreed too, we will have our Lawyer Elliott Kleinberg work out the long form agreement with Production Company's counsel. Before the second payment is made to the production, the production company will provide copies of the chain of title, insurance policy and talent deal memos.


Thank You


Henri M. Kessler
Co President

Agreed to and accepted by :

Deborah Kampmeier, Director/Writer   Date

8157 Mulholland Terrace, Los Angeles, CA 90046
Tel 310.492.5560 • Fax 310.861.5136
www.themotionpicturegroup.com • info@themotionpicturegroup.com

# EXHIBIT 4

# MEMORANDUM OF AGREEMENT

This Memorandum of Agreement ("MOA") is entered into to be effective as of the 7th day of March, 2008 between the following Parties:

**1. Licensor:**   Hounddog, LLC / Motion Picture Group, Inc.
c/o Linda Lichter
9200 Sunset Blvd., # 1200
Los Angeles, CA 90069
Tel. 310-205-6999 / Fax 310-205-6990
Email: Llichter@lgna.com, scott@fredfilms.com
("Licensor")

**2. Distributor:**   Empire Film Group, Inc.
Attn: Dean Hamilton-Bornstein, President
433 N. Camden Drive, Suite 600
Beverly Hills, CA 90210
Tel. 310-317-4456 / Fax 479-575-9393
Email: dbadh@aol.com, hannoverhouse@aol.com
("Distributor")

*Licensor shall grant to the distributor the exclusive Rights in the Picture for exploitation in the Territory during the Term (all as defined herein) subject to the terms and conditions set out herein. The mention in this MOA of any rights not specifically licensed to Distributor pursuant to Paragraph 3 hereof does not grant to distributor expressly or by implication any rights not specifically licensed in such Paragraph. All initially capitalized terms not otherwise defined herein shall have the meaning specified in the IFTA Schedule of Definitions, which in addition to the IFTA Standard Terms and Conditions, shall be attached hereto and incorporated herein by reference as Exhibit B (hereinafter be collectively referred to as the "IFTAST")*

**1. PICTURE:**   *"HOUNDDOG" – a feature length, period drama starring Dakota Fanning, Robin Wright, David Morse and Piper Laurie, directed by Deborah Kampmeier.*

**2. TERRITORY:**   The "Territory" is defined as the United States, its territories and possessions, and all embassies and other premises of diplomatic services, oil rigs, military bases and marine installations, airlines in flight and ships at sea flying the flag of and registered in the United States, and Canada, including French-speaking regions.

**3. RIGHTS LICENSED:**   All media rights whether now known or hereinafter created during the Term, including, but not limited to, Cinematic Rights (including public video), Video Rights (including rental, sell-thru, DVD, Blu-Ray), Pay Per View, Pay TV, Free TV and Digital Streaming formats.   All other ancillary rights (merchandising, soundtrack, subsequent productions, etc.) are expressly reserved.

Empire Film Group, Inc. / North American Rights / 03-05-08 (HOUNDDOG)
- 1 -

P-0030

Only the Authorized Language versions of the Picture shall be exploited or otherwise distributed by Distributor in the Pay Satellite Television and Free Satellite Television broadcasts in the Territory, which shall be restricted to the boundaries of the Territory, unless otherwise pre-approved in writing by Licensor.

**AUTHORIZED LANGUAGES:** English, Spanish and French.

**4. TERM:** The "Term" shall commence on the date hereof and continue for ten (10) years thereafter ("Initial Term"). Upon expiration of the Initial Term, if net revenues actually received by Licensor equals or exceeds the amount of three-million-five-hundred thousand dollars (USD $3,500,000), the Initial Term shall be extended by an additional ten (10) year period (the "Extended Term").

**5. APPROVALS & MINIMUM PRINTS
& ADVERTISING BUDGET:**

Distributor shall expend no less than two-million dollars (USD $2,000,000) in direct marketing/P&A costs for the release of the Picture (the "Minimum P&A Spend"), with an opening weekend launch to not less than two-hundred (200) theaters. In the event that the Minimum P&A Spend is not achieved by November 30, 2008 (or 120 days following Delivery, whichever occurs later), then, following Licensor's written notice to Distributor and Distributor being afforded a thirty (30) day cure period, this Agreement shall terminate and all rights granted to Distributor hereunder shall immediately revert to Licensor. On or before November 30, 2008, Distributor shall provide Licensor with a detailed budget and report of qualifying expenditures comprising the Minimum P&A Spend, with reasonable back-up and proof of payment.

Notwithstanding the foregoing, Distributor shall obtain Licensor's prior written approval regarding the Cinematic and Video release of the Picture, if any, regarding such matters as pricing, release dates, P&A, marketing budgets, etc., said approvals by Licensor not to be unreasonably withheld. Direct marketing/P&A costs in excess of the Minimum P&A Spend must be approved in writing by Licensor and for the purposes of this Agreement, shall be deemed "Additional P&A Spend," said approvals by Licensor not to be unreasonably withheld.

**6. THEATRICAL RELEASE:**

Distributor shall cause the Picture to be released in the Initial Markets as defined in Paragraph 7 below, by no later than November 30, 20089 or 120 days following Delivery. Notwithstanding the above, if the Picture performs at an opening weekend per screen average of five-thousand dollars (USD $5,000) or more, Distributor agrees to immediately add at least one-hundred (100) additional prints and ten (10) new markets out of the top

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)
- 2 -

P-0031

fifty (50) DMAs (the "Additional Markets"). Distributor agrees to notify Licensor in writing of its release plans for the Additional Markets and Licensor shall be afforded reasonable approval rights.

**7. INITIAL MARKETS:**

> New York, NY
> Los Angeles, CA
> Chicago, IL
> Philadelphia, PA
> Boston, MA
> San Francisco, CA
> Dallas-Ft. Worth, TX
> Washington, DC
> Atlanta, GA
> Houston, TX
> Detroit, MI
> Tampa – St. Petersburg, FL
> Seattle – Tacoma, WA
> Phoenix, AZ
> Minneapolis – St. Paul, MN
> Cleveland – Akron, OH
> Miami – Ft. Lauderdale, FL
> Denver, CO
> Sacramento – Stockton – Modesto, CA
> Orlando – Daytona Beach, FL
> Fayetteville / NW Arkansas

**8. DISTRIBUTION TERMS:**

**A. CINEMATIC RIGHTS:** Gross Receipts derived from the exploitation of Cinematic Rights ("Cinematic Gross Receipts") shall be divided between Licensor and Distributor on a "gross" basis, meaning Distributor shall not deduct any costs whatsoever, other than as follows and in the following order:

(1) **Distribution Fee.** First, Distributor shall retain twenty-five percent (25%) of Cinematic Gross Receipts as a Distribution Fee.

(2) **Recoupment of Recoupable Prints and Advertising Budget (as defined in Section 5 above).** Next, Distributor shall retain the remaining seventy-five percent (75%) of Cinematic Gross Receipts to recoup the Minimum P&A Spend and any Additional P&A Spend.

(3) **Sharing of Cinematic Gross Receipts After the Prints and Advertising Budget is recouped.** Thereafter, Distributor shall retain twenty-five percent (25%) of Cinematic Gross Receipts for itself and shall remit the balance of seventy-five percent (75%) of Cinematic Gross Receipts to Licensor.

**B. Video Rights (Rental, Sell-Through, DVD and Blu-Ray).** Gross Receipts derived from the exploitation of Home Video (Rental, Sell-Through, DVD and Blu-Ray) Rights shall be divided between Licensor and Distributor on a "gross" basis as follows and in the following order:

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)

- 1 -

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com
This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

(1) **Video: Recoupment of Minimum Prints and Advertising Budget.** First, Distributor may remit 100% of Licensor's share of Video (Rental, Sell-Through, DVD and Blu-Ray) Gross Receipts ("Video Gross Receipts") to recoup any portion of the Minimum P&A Spend and any Additional P&A Spend remaining unrecouped after first applying Paragraph 8a(2) above.

(2) **Video: Recoupment of Video replication, marketing and fulfillment costs.** Next, Distributor shall be entitled to recoup Distributor's direct, third party costs incurred spent in the promotion, marketing, advertising, manufacturing and fulfillment of Video orders for the Picture.

(3) **Video: Sharing of Gross Receipts After Prints and Advertising and Video Releasing Costs are Recouped.** Next, Distributor shall retain twenty-five percent (25%) of all Video Gross Receipts as a Distribution Fee and shall remit the balance of seventy-five percent (75%) of all Video Gross Receipts to Licensor.

C. **Television Rights (Free TV, Pay TV and Pay Per View).** Gross Receipts derived from the exploitation of Television (Pay TV, Free TV and PPV) Rights ("Television Gross Receipts") shall be divided between Licensor and Distributor on a "gross" basis (meaning Distributor shall not deduct any costs whatsoever, other than as follows and in the following order except as specified below):

(1) **Recoupment of Recoupable Prints and Advertising Budget.** First, Distributor may retain 100% of Television (Pay TV, Free TV, and PPV) Gross Receipts to recoup any portion of the Minimum P&A Spend and Additional P&A Spend remaining unrecouped after first applying Paragraphs 8a(2) and 8b(2) above.

(2) **Sharing of Television Gross Receipts After the Prints and Advertising Budget is Recouped.** Next, shall retain twenty-five percent (25%) of all Television (Pay TV, Free TV, and PPV) Gross Receipts as a Distribution Fee and shall remit seventy-five percent (75%) of all Television (Pay TV, Free TV, and PPV) Gross Receipts to Licensor.

D. **Internet "Streaming" Delivery Formats.** Gross Receipts derived from the exploitation of direct-to-consumer "Internet Streaming" or Video-On-Demand ("VOD") or digital download to rent or own, shall be divided between Licensor and Distributor on a "gross" basis as follows and in the following order:

(1) **Internet Streaming: Recoupment of Minimum Prints and Advertising Budget.** First, Distributor may retain 100% of Licensor's Share of Internet Streaming (direct-to-consumer) Gross Receipts ("Streaming Gross Receipts") to recoup any portion of the Minimum P&A Spend and Additional P&A Spend remaining unrecouped after first applying Paragraphs 8a(2), 8b(2) and 8c(1) above.

(2) **Internet Streaming: Sharing of Gross Receipts After the Prints and Advertising Budget is Recouped.** Next, shall retain twenty percent (20%) of all Internet Streaming Gross Receipts as a Distribution Fee and shall remit the balance of eighty percent (80%) of all Internet Streaming Gross Receipts to Licensor.

E. **Distributor's Bonus Fee Level** – At such point in time as Distributor recoups the Minimum P&A Spend and any Additional P&A Spend in full, and Licensor's share of all Gross Revenue streams has exceeded the total of Licensor's Advance and Minimum Guarantee as specified in Paragraph 9 below, the Distribution Fees payable to Distributor hereunder for all media except

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com
This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Internet Streaming (as defined in Paragraph 8d above) shall be prospectively increased to thirty percent (30%) of Gross Receipts generated thereafter.

9.   **Licensor's Advance Payment, Minimum Guarantee & Corridor of Gross Receipts** – Distributor shall pay to Licensor the following sums as an Advance and Minimum Guarantee (the "Advance and Minimum Guarantee") of one-million dollars (USD $1,000,000) as follows:

A.   **Initial Payment** – within ten (10) days following execution of this Agreement, Distributor shall pay to Licensor the sum of two-hundred-fifty thousand dollars (USD $250,000);

B.   **Delivery Payment** – within ten (10) days following Delivery of the Picture (as defined below), Distributor shall pay to Licensor the sum of three-hundred-fifty-thousand dollars (USD $350,000); time is of the essence with respect to Delivery, and Licensor represents that Delivery of the Picture shall occur on or before May 15, 2008;

C.   **Minimum Guarantee Final Payment** – On or before October 31, 2008, and based upon Licensor actually making Delivery of the Picture as defined below, Distributor shall pay to Licensor the sum of four-hundred-thousand dollars (USD $400,000) unless Licensor's share of revenues or Licensor's Gross Corridor of Revenues as described in Paragraph 9d below shall have previously retired this final payment obligation;

All sums paid by Distributor to Licensor as Advance and Minimum Guarantee shall be considered as recoupable advances against Licensor's share of any and all revenue streams as defined in this Agreement under Paragraph 8.

D.   **Licensor's Gross Corridor of Revenues** – Notwithstanding the formulas for the distribution of revenues as described in Paragraph 8 above, Licensor shall be entitled to receive fifty percent (50%) of all gross revenues received from any and all gross receipts realized by Distributor from the exploitation of the Picture, which would include any and all revenue streams under this Agreement until such time that Licensor shall have received the Minimum Guarantee Final Payment as described in Paragraph 9c above ("Licensor's Gross Corridor"). At such point in time that the Minimum Guarantee Final Payment to Licensor shall have been fully paid, then the Licensor's Gross Corridor shall be eliminated for all revenues thereafter, with the formulas as described in Paragraph 8 for the distribution of revenues thereinafter prevailing. The creation of this Licensor's Gross Corridor of Revenues does not release Distributor from the obligation to pay the Minimum Guarantee Final Payment as described in Paragraph 9c above, in the event that Licensor's Gross Corridor of Revenues does not retire the Minimum Guarantee Final Payment.

For clarity, distribution rights granted to Distributor in the Picture under this Agreement do not transfer and are not fully vested until such time that Distributor has paid to Licensor the Initial Payment and Delivery Payment as described in Paragraphs 9a and 9b above. Additionally, any and all distribution rights granted to Distributor under this Agreement may be revoked by Licensor in the event that Distributor fails to pay the Minimum Guarantee Final Payment as described in Paragraph 9c above.

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)

-5-

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

## 10. SPECIAL TERMS

(a) *Gross Receipts* shall, until otherwise instructed in writing by Licensor, be paid by the Distributor directly into the following account by wire transfer in United States dollars:

(LGNA Client Trust Account details to be provided)

(b) The Picture shall not be altered by Distributor except for censorship, broadcast standards or as otherwise required by law. Under no circumstances shall Distributor modify the copyright notice or the credits in the Picture.

(c) This Agreement may be terminated by Licensor in the event that Distributor fails to timely pay any amounts under this Agreement as and when due.

(d) Distributor shall render account reports to Licensor on a calendar quarterly basis, due within forty-five (45) days of the close of each calendar quarter, and accompanied by any applicable payments due to Licensor.

(e) Presentation Credit – Distributor and key executives of Distributor shall be listed as the "Presenters" of the Picture on the credit block, film prints and video masters and video copies in first position ahead of the credit block details to be specified by Licensor, in the Territory.

(f) Distributor's Logo – Distributor may include its logo, "Empire Film Group" on all film prints of the Picture and its video logo, "Empire Home Entertainment") on all video format releases of the Picture, as well as on all theatrical release prints, posters, ads and video packaging, in the Territory.

(g) Key Talent Support of Publicity – To the fullest extent reasonably possible, Licensor shall provide or otherwise arrange for the services of Dakota Fanning to assist Distributor with national promotion of the Picture, including, but not limited to, key national television talk show appearances, on the condition that all publicity and promotional support required of Dakota Fanning be limited to not more than five (5) consecutive days preceding the Picture's initial theatrical release.

(h) Licensor shall be entitled to file and maintain a first position Security Interest in the revenues of the Picture as generated by Distributor, as security for Licensor's unpaid Minimum Guarantee Final Payment and any other sums due to Licensor under this Agreement.

(i) Guild Assumption Agreements – Distributor agrees to sign and honor any necessary and applicable Guild Assumption Agreements relating to the Picture, including the Screen Actor's Guild Assumption Agreement for distributors, as customarily utilized to secure the S.A.G. residuals due to performers in the Picture.

(j) Collection Account – In respect of Licensor's Gross Corridor of Revenues and Security Interest as described in Paragraph 10(i) above, Distributor agrees to direct any and all revenues into a segregated bank account (the "Collection Account") and to provide to Licensor a monthly statement of collected revenues deposited into the Collection Account until such time that Licensor's Minimum Guarantee Final Payment shall have been fully paid. Thereafter, Distributor shall no longer be required to utilize a segregated Collection Account.

## 11. NOTICES. All Notices must be in writing and sent to a Party at the address on the Cover Page by fax, telex, telegram or first class mail. Notice will be effective when received.

Empire Film Group, Inc. / North American Rights / 03-03-08 (HOUNDDOG)
-6-

This fax was received by GFI FAXmaker fax server. For more information, visit http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit http://www.gfi.com

03/10/2008 09:28 FAX 3103174310

☑003

Either Party my change its place for Notice by Notice duly given. Additional Notices shall be sent to the following parties:

Each of the Parties agrees to execute a long form agreement in respect of the Picture as soon as possible containing the foregoing terms as well as others customary for this type of transaction. Until such long form agreement has been executed, this MOA constitutes a legally binding and enforceable agreement between the Parties. In the event that Distributor shall fail to make any payment due in according with the terms hereof or is otherwise in breach of this MOA, then the Licensor shall have the right (in addition to any other remedy available to it at law, in equity or otherwise) to cancel this MOA upon notice to the Distributor and upon any such cancellation the Licensor shall have no further obligation to the Distributor in respect of the Picture.

For and on behalf of Licensor:

HOUNDDOG, LLC
MOTION PICTURE GROUP, INC.

By: _____

Its: _____

For and on behalf of Distributor:

EMPIRE FILM GROUP, INC.

By: _____

Its: _____President_____

By: _____

Its: _____

Empire Film Group, Inc. / North American Rights / 03-05-08 (#HOUNDDOG)
- 7 -

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com
This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

03/10/2008 09:29 FAX 3103174310          CGM FILMS                                              ☎003

## EXHIBIT A
## DELIVERY ITEMS

It is understood and agreed that Licensor shall deliver to Distributor all of the physical film and video master elements as would be customarily required to effect release of the Picture and for Distributor to perform its duties under this Agreement. Licensor shall also deliver all relevant documentation and paperwork. Notwithstanding the items listed below, Licensor shall deliver to Distributor a completed, 35mm Interpositive and Internegative of the Picture (with applicable, synchronized soundtrack elements), and a high definition format video master made from a scene-by-scene color-corrected transfer. Additional delivery items will include:

### A. Initial Materials

* 35mm Internegative
* 35mm Interpositive
* Applicable sound elements
* HD format video master
* Art elements (receipt hereby acknowledged)

### B. Additional Materials

* Chain of Title Documentation
* Music Clearances
* Legal requirements relative to Credit Block
* Copyright certificate (if available)
* MPAA Rating certificate (if available)
* Press book or supporting materials for publicity

**C. Method of Delivery:** By Physical Delivery, Laboratory Access, Loan of Materials or otherwise as determined by Distributor.

**D. Materials Shipping Instructions:** to be provided by Distributor.

**E. Laboratory Inspection:** Distributor shall have up to ten (10) days to obtain laboratory approval of all film and video elements delivered by Licensor. If Distributor does not provide written objection to Licensor regarding the technical suitability of any of these film or video elements within ten (10) days of Licensor's Delivery to Laboratory, then all elements shall be deemed to have been accepted as suitable by Distributor and Delivery of the Picture shall be deemed complete with respect to film and video master elements.

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)

- 8 -

P-0037

From: 13102056990     Page: 9/17     Date: 3/11/2008 10:45:19 AM

From: 8453590011     Page: 10/10     Date: 3/10/2008 12:32:39 PM

03/10/2008 09:28 FAX 3103174310     CGM FILMS     ☑010

# EXHIBIT B
## IFTA STANDARD TERMS AND CONDITIONS
*(to be attached)*

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com
This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

P-0038

3/10/2008

# MEMORANDUM OF AGREEMENT

norandum of Agreement ("MOA") is entered into to be effective as of the 7ᵗʰ day of March, woen the following Parties:

**sor:**
**Hounddog, LLC / Motion Picture Group, Inc.**
c/o Linda Lichter
9200 Sunset Blvd., # 1200
Los Angeles, CA 90069
Tel. 310-205-6999 / Fax 310-205-6990
Email: Llichter@lgna.com, scott@fredfilms.com
("Licensor")

**butor:**
**Empire Film Group, Inc.**
Attn: Dean Hamilton-Bornstein, President
433 N. Camden Drive, Suite 600
Beverly Hills, CA 90210
Tel. 310-317-4456 / Fax 479-575-9393
Email: dbedh@aol.com, hamoverhouse@aol.com
("Distributor")

*hall grant to the distributor the exclusive Rights in the Picture for exploitation in the Territory Term (all as defined herein) subject to the terms and conditions of any rights not specifically licensed to Distributor pursuant to Paragraph 3 hereof does not intributor expressly or by implication any rights not specifically licensed in such Paragraph. y capitalized terms not otherwise defined herein shall have the meaning specified in the IFTA of Definitions, which in addition to the IFTA Standard Terms and Conditions, shall be xrein and incorporated herein by reference as Exhibit B (hereinafter be collectively referred IFTAST")*

**IRE:** *"HOUNDDOG" – a feature length, period drama starring Dakota Fanning, Robin Wright, David Morse and Piper Laurie, directed by Deborah Kampmeier.*

**ITORY:** The "Territory" is defined as the United States, its territories and possessions, and all embassies and other premises of diplomatic services, oil rigs, military bases and marine installations, airlines in flight and ships at sea flying the flag of and registered in the United States, and Canada, including French-speaking regions.

**TS LICENSED:** All media rights whether now known or hereinafter created during including, but not limited to, Cinematic Rights (including public video), Video Rights rental, sell-thru, DVD, Blu-Ray), Pay Per View, Pay TV, Free TV and Digital formats. All other ancillary rights (merchandising, soundtrack, subsequent s, etc.) are expressly reserved.

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)
- 1 -

P-0039

From: 13102056990     Page: 11/17     Date: 3/11/2008 10:45:20 AM

3/10/2008

uthorized Language versions of the Picture shall be exploited or otherwise distributed by in the Pay Satellite Television and Free Satellite Television broadcasts in the Territory, be restricted to the boundaries of the Territory, unless otherwise pre-approved in writing

**[ZE]D LANGUAGES:** English, Spanish and French.

The "Term" shall commence on the date hereof and continue for ten (10) years thereafter m"). Upon expiration of the Initial Term, if net revenues actually received by Licensor reeds the amount of three-million-five-hundred thousand dollars (USD $3,500,000), the . shall be extended by an additional ten (10) year period (the "Extended Term").

**VALS & MINIMUM PRINTS
TISING BUDGET:**

Distributor shall expend no less than two-million dollars (USD $2,000,000) in direct marketing/P&A costs for the release of the Picture (the "Minimum P&A Spend"), with an opening weekend launch to not less than two-hundred (200) theatres. In the event that the Minimum P&A Spend is not achieved by November 30, 2008 (or 120 days following Delivery, whichever occurs later), then, following Licensor's written notice to Distributor and Distributor being afforded a thirty (30) day cure period, this Agreement shall terminate and all rights granted to Distributor hereunder shall immediately revert to Licensor. On or before November 30, 2008, Distributor shall provide Licensor with a detailed budget and report of qualifying expenditures comprising the Minimum P&A Spend, with reasonable back-up and proof of payment.

Notwithstanding the foregoing, Distributor shall obtain Licensor's prior written approval regarding the Cinematic and Video release of the Picture, if any, regarding such matters as pricing, release dates, P&A, marketing budgets, etc., said approvals by Licensor not to be unreasonably withheld. Direct marketing/P&A costs in excess of the Minimum P&A Spend must be approved in writing by Licensor and for the purposes of this Agreement, shall be deemed "Additional P&A Spend," said approvals by Licensor not to be unreasonably withheld.

**TRICAL RELEASE:**

Distributor shall cause the Picture to be released in the Initial Markets as defined in Paragraph 7 below, by no later than November 30, 2008, or 120 days following Delivery. Notwithstanding the above, if the Picture performs at an opening weekend per screen average of five-thousand dollars (USD $5,000) or more, Distributor agrees to immediately add at least one-hundred (100) additional prints and ten (10) new markets out of the top

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)

- 2 -

3/10/2008

shall be afforded reasonable approval rights.

ARKETS:

New York, NY
Los Angeles, CA
Chicago, IL
Philadelphia, PA
Boston, MA
San Francisco, CA
Dallas-Ft. Worth, TX
Washington, DC
Atlanta, GA
Houston, TX
Detroit, MI
Tampa – St. Petersburg, FL
Seattle – Tacoma, WA
Phoenix, AZ
Minneapolis – St. Paul, MN
Cleveland – Akron, OH
Miami – Ft. Lauderdale, FL
Denver, CO
Sacramento – Stockton – Modesto, CA
Orlando – Daytona Beach, FL
Fayetteville / NW Arkansas

TION TERMS:

IC RIGHTS:  Gross Receipts derived from the exploitation of Cinematic Rights
iss Receipts") shall be divided between Licensor and Distributor on a "gross" basis
itor shall not deduct any costs whatsoever, other than as follows and in the following

tion Fee.  First, Distributor shall retain twenty-five percent (25%) of Cinematic
eceipts as a Distribution Fee.

nent of Recoupable Prints and Advertising Budget (as defined in Section 5
Next, Distributor shall retain the remaining seventy-five percent (75%) of Cinematic
eceipts to recoup the Minimum P&A Spend and any Additional P&A Spend.

of Cinematic Gross Receipts After the Prints and Advertising Budget is
d.  Thereafter, Distributor shall retain twenty-five percent (25%) of Cinematic Gross
for itself and shall remit the balance of seventy-five percent (75%) of Cinematic
eceipts to Licensor.

ts (Rental, Sell-Through, DVD and Blu-Ray).  Gross Receipts derived from the
Home Video (Rental, Sell-Through, DVD and Blu-Ray) Rights shall be divided
r and Distributor on a "gross" basis as follows and in the following order:

Brophie Film Group, Inc. / North American Rights / 03-08-09 (HOUNDDOG)
- 3 -

P-0041

3/10/2008

leo:  Recoupment of Minimum Prints and Advertising Budget.  First, Distributor may
in 100% of Licensor's share of Video (Rental, Sell-Through, DVD and Blu-Ray) Gross
cipts ("Video Gross Receipts") to recoup any portion of the Minimum P&A Spend and
Additional P&A Spend remaining unrecouped after first applying Paragraph 8a(2) above.

leo:  Recoupment of Video replication, marketing and fulfillment costs.  Next,
tributor shall be entitled to recoup Distributor's direct, third party costs incurred spent in
promotion, marketing, advertising, manufacturing and fulfillment of Video orders for the
ture.

leo:  Sharing of Gross Receipts After Prints and Advertising and Video Releasing
sts are Recouped.  Next, Distributor shall retain twenty-five percent (25%) of all Video
ss Receipts as a Distribution Fee and shall remit the balance of seventy-five percent
%) of all Video Gross Receipts to Licensor.

sion Rights (Free TV, Pay TV and Pay Per View).  Gross Receipts derived from the
n of Television (Pay TV, Free TV and PPV) Rights ("Television Gross Receipts") shall be
tween Licensor and Distributor on a "gross" basis (meaning Distributor shall not deduct
hatsoever, other than as follows and in the following order except as specified below):

coupment of Recoupable Prints and Advertising Budget.  First, Distributor may retain
% of Television (Pay TV, Free TV, and PPV) Gross Receipts to recoup any portion of the
nimum P&A Spend and Additional P&A Spend remaining unrecouped after first applying
agraphs 8a(2) and 8b(2) above.

aring of Television Gross Receipts After the Prints and Advertising Budget is
couped.  Next, shall retain twenty-five percent (25%) of all Television (Pay TV, Free TV,
PPV) Gross Receipts as a Distribution Fe and shall remit seventy-five percent (75%) of
Television (Pay TV, Free TV, and PPV) Gross Receipts to Licensor.

al "Streaming" Delivery Formats.  Gross Receipts derived from the exploitation of
stomer "Internet Streaming" or "Video-On-Demand" ("VOD") or digital download to rent
all be divided between Licensor and Distributor on a "gross" basis as follows and in the
order:

ternet Streaming:  Recoupment of Minimum Prints and Advertising Budget.  First,
tributor may retain 100% of Licensor's Share of Internet Streaming (direct-to-consumer)
oss Receipts ("Streaming Gross Receipts") to recoup any portion of the Minimum P&A
end and Additional P&A Spend remaining unrecouped after first applying Paragraphs
2), 8b(2) and 8c(1) above.

ternet Streaming:  Sharing of Gross Receipts After the Prints and Advertising Budget
Recouped.  Next, shall retain twenty percent (20%) of all Internet Streaming Gross
ceipts as a Distribution Fe and shall remit the balance of eighty percent (80%) of all
ernet Streaming Gross Receipts to Licensor.

butor's Bonus Fee Level – At such point in time as Distributor recoups the Minimum
d and any Additional P&A Spend in full, and Licensor's share of all Gross Revenue
is exceeded the total of Licensor's Advance and Minimum Guarantee as specified in
9 below, the Distribution Fees payable to Distributor hereunder for all media except

Empire Film Group, Inc. / North American Rights / 03-05-08 (HOUNDDOG)
-4-

x was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Page 4 of 10

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

3/10/2008

nsor's Advance Payment, Minimum Guarantee & Corridor of Gross Receipts –
ur shall pay to Licensor the following sums as an Advance and Minimum Guarantee (the
s and Minimum Guarantee") of one-million dollars (USD $1,000,000) as follows:

**A.**   Initial Payment – within ten (10) days following execution of this Agreement,
         Distributor shall pay to Licensor the sum of two-hundred-fifty thousand dollars
         (USD $250,000);

**B.**   Delivery Payment – within ten (10) days following Delivery of the Picture (as
         defined below), Distributor shall pay to Licensor the sum of three-hundred-fifty-
         thousand dollars (USD $350,000);   time is of the essence with respect to
         Delivery, and Licensor represents that Delivery of the Picture shall occur on or
         before May 15, 2008;

**C.**   Minimum Guarantee Final Payment – On or before October 31, 2008, and
         based upon Licensor actually making Delivery of the Picture as defined below,
         Distributor shall pay to Licensor the sum of four-hundred-thousand dollars (USD
         $400,000) unless Licensor's share of revenues or Licensor's Gross Corridor of
         Revenues as described in Paragraph 9d below shall have previously retired this
         final payment obligation;

paid by Distributor to Licensor as Advance and Minimum Guarantee shall be considered as
le advances against Licensor's share of any and all revenue streams as defined in this
it under Paragraph 8.

licensor's Gross Corridor of Revenues – Notwithstanding the formulas for the distribution
les as described in Paragraph 8 above, Licensor shall be entitled to receive fifty percent
all gross revenues received from any and all gross receipts realized by Distributor from the
on of the Picture, which would include any and all revenue streams under this Agreement
. time that Licensor shall have received the Minimum Guarantee Final Payment as described
aph 9c above ("Licensor's Gross Corridor").   At such point in time that the Minimum
: Final Payment to Licensor shall have been fully paid, then the Licensor's Gross Corridor
liminated for all revenues thereafter, with the formulas as described in Paragraph 8 for the
on of revenues thereinafter prevailing.  The creation of this Licensor's Gross Corridor of
does not release Distributor from the obligation to pay the Minimum Guarantee Final
as described in Paragraph 9c above, in the event that Licensor's Gross Corridor of
does not retire the Minimum Guarantee Final Payment.

y, distribution rights granted to Distributor in the Picture under this Agreement do not
nd are not fully vested until such time that Distributor has paid to Licensor the Initial
and Delivery Payment as described in Paragraphs 9a and 9b above. Additionally, any and
otion rights granted to Distributor under this Agreement may be revoked by Licensor in the
. Distributor fails to pay the Minimum Guarantee Final Payment as described in Paragraph

Empire Film Group, Inc./ North American Rights / 03-08-08 (HOUNDDOG)
- 5 -

P-0043

3/10/2008

n the following account by wire transfer in United States dollars:

(LGNA Client Trust Account details to be provided)

cture shall not be altered by Distributor except for censorship, broadcast standards or as required by law. Under no circumstances shall Distributor modify the copyright notice or in the Picture.

greement may be terminated by Licensor in the event that Distributor fails to timely pay ts under this Agreement as and when due.

utor shall render account reports to Licensor on a calendar quarterly basis, due within (45) days of the close of each calendar quarter, and accompanied by any applicable hue to Licensor.

tation Credit – Distributor and key executives of Distributor shall be listed as the l" of the Picture on the credit block, film prints and video masters and video copies in first ead of the credit block details to be specified by Licensor, in the Territory.

sor's Logo – Distributor may include its logo, "Empire Film Group" on all film prints of : and its video logo, "Empire Home Entertainment") on all video format releases of the well as on all theatrical release prints, posters, ads and video packaging, in the Territory.

alent Support of Publicity – To the fullest extent reasonably possible, Licensor shall otherwise arrange for the services of Dakota Fanning to assist Distributor with national of the Picture, including, but not limited to, key national television talk show appearances, dition that all publicity and promotional support required of Dakota Fanning be limited to ten five (5) consecutive days preceding the Picture's initial theatrical release.

or shall be entitled to file and maintain a first position Security Interest in the revenues of s as generated by Distributor, as security for Licensor's unpaid Minimum Guarantee Final nd any other sums due to Licensor under this Agreement.

Assumption Agreements – Distributor agrees to sign and honor any necessary and Guild Assumption Agreements relating to the Picture, including the Screen Actor's Guild n Agreement for distributors, as customarily utilized to secure the S.A.G. residuals due to in the Picture.

tion Account – In respect of Licensor's Gross Corridor of Revenues and Security Interest ed in Paragraphy10(f) above, Distributor agrees to direct any and all revenues into a bank account (the "Collection Account") and to provide to Licensor a monthly statement d revenues deposited into the Collection Account until such time that Licensor's Minimum Final Payment shall have been fully paid. Thereafter, Distributor shall no longer be utilize a segregated Collection Account.

CES. All Notices must be in writing and sent to a Party at the address on the Cover Page x, telegram or first class mail. Notice will be effective when received.

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)
- 6 -

fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

P-0044

3/10/2008

ies agrees to execute a long form agreement in respect of the Picture as soon as ng the foregoing terms as well as others customary for this type of transaction. Until greement has been executed, this MOA constitutes a legally binding and enforceable en the Parties. In the event that Distributor shall fail to make any payment due in 1e terms hereof or is otherwise in breach of this MOA, then the Licensor shall have tion to any other remedy available to it at law, in equity or otherwise) to cancel this ce to the Distributor and upon any such cancellation the Licensor shall have no 1 to the Distributor in respect of the Picture.

f of Licensor:

LC
1RE GROUP, INC.

For and on behalf of Distributor:

EMPIRE FILM GROUP, INC.

By:

Its:  *President*

; received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

P-0045

3/10/2008

## EXHIBIT A
## DELIVERY ITEMS

stood and agreed that Licensor shall deliver to Distributor all of the physical film and video ments as would be customarily required to effect release of the Picture and for Distributor i its duties under this Agreement.  Licensor shall also deliver all relevant documentation work.  Notwithstanding the items listed below, Licensor shall deliver to Distributor a , 35mm Interpositive and Internegative of the Picture (with applicable, synchronized ( elements), and a high definition format video master made from a scene-by-scene color-ransfer. Additional delivery items will include:

Materials

* 35mm Internegative
* 35mm Interpositive
* Applicable sound elements
* HD format video master
* Art elements (receipt hereby acknowledged)

mal Materials

* Chain of Title Documentation
* Music Clearances
* Legal requirements relative to Credit Block
* Copyright certificate (if available)
* MPAA Rating certificate (if available)
* Press book or supporting materials for publicity

t of Delivery:  By Physical Delivery, Laboratory Access, Loan of Materials or otherwise ed by Distributor.

ils Shipping Instructions: to be provided by Distributor.

tory Inspection:  Distributor shall have up to ten (10) days to obtain laboratory approval and video elements delivered by Licensor.  If Distributor does not provide written Licensor regarding the technical suitability of any of these film or video elements within s of Licensor's Delivery to Laboratory, then all elements shall be deemed to have been suitable by Distributor and Delivery of the Picture shall be deemed complete with respect rideo master elements.

Empire Film Group, Inc. / North American Rights / 03-03-08 (HOUNDDOG)
- 8 -

was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

P-0046

3/10/2008

ies agrees to execute a long form agreement in respect of the Picture as soon as
ng the foregoing terms as well as others customary for this type of transaction. Until
greement has been executed, this MOA constitutes a legally binding and enforceable
en the Parties. In the event that Distributor shall fail to make any payment due in
1e terms hereof or is otherwise in breach of this MOA, then the Licensor shall have
tion to any other remedy available to it at law, in equity or otherwise) to cancel this
ce to the Distributor and upon any such cancellation the Licensor shall have no
1 to the Distributor in respect of the Picture.

f of Licensor:                          For and on behalf of Distributor:

LC
JRE GROUP, INC.                         EMPIRE FILM GROUP, INC.

                                        By:

                                        Its:  President

Empire Film Group, Inc. / North American Rights / 03-08-08 (HOUNDDOG)
                                  - 7 -

received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

P-0047

# EXHIBIT 5

## LICHTER, GROSSMAN, NICHOLS & ADLER, INC.

ATTORNEYS AT LAW

9200 SUNSET BOULEVARD

SUITE 1200

LOS ANGELES, CALIFORNIA 90069-3507

PETER GROSSMAN
LINDA LICHTER
PETER NICHOLS
MICHAEL I. ADLER
JAMES FELDMAN*
STEPHEN P. CLARK
JONATHAN E. SHIKORA
MELISSA POGAL

*ALSO ADMITTED IN NEW YORK

TELEPHONE (310) 205-6999
FAX (310) 205-6990

OF COUNSEL

CYNTHIA FARNELLY GESNER
A PROFESSIONAL CORPORATION

sclark@lgna.com

November 4, 2008

File No. A1141.3

**VIA EMAIL AND U.S. MAIL**

Eric Parkinson and Dean Hamilton-Bornstein
Empire Film Group / Hannover House / EHE
433 N. Camden Drive, Suite 600
Beverly Hills, CA 90210

Re:    "Hounddog"

Dear Mr. Parkinson and Mr. Hamilton-Bornstein:

Please refer that certain fully executed Memorandum of Agreement dated ("Agreement") as of March 7, 2007 between Hounddog, LLC/Motion Picture Group, Inc. ("Licensor"), on the one hand, and Empire Film Group, Inc. ("Distributor"), on the other. Paragraph 9.C. of the Agreement requires that the "Minimum Guarantee Final Payment" be paid "[o]n or before October 31, 2008" and paragraph 9.D. provides that "any and all distribution rights granted to Distributor under this Agreement may be revoked by Licensor in the event that Distributor fails to pay the Minimum Guarantee Final Payment as described in paragraph 9c above."

As you know, Empire did not make the Minimum Guarantee Final Payment by October 31, 2008. Accordingly, please accept this as Licensor's notice of revocation of any and all distribution rights granted to Empire under the Agreement.

This is not a complete recitation of the facts nor of our client's rights and remedies in connection with this matter, all of which are expressly reserved.

Sincerely,

Stephen P. Clark

SPC/dr
cc:    Deborah Kampmeier
       Scott Franklin
       Linda Lichter, Esq.

# EXHIBIT 6

**From:** Evan Kaye <goldenventures@gmail.com>
**Date:** January 8, 2009 9:34:51 AM EST
**To:** Franklyn Franklin <scott@fredfilms.com>
**Subject: another one!**

## Retail Support for Hounddog DVD Doubles Pre-Sale Estimates for Empire and Hannover House

*Jan 7, 2009 4:20:00 PM*
*2009 GlobeNewswire, Inc.*

Email Story   Discuss on ZenoBank

1

P-0146

View Additional Profiles

BEVERLY HILLS, Calif., Jan. 7, 2009 (GLOBE NEWSWIRE) -- Empire Film Group, Inc. (Pink Sheets:EFGU) (http://www.empirefilmgroup.com) reports strong retailer support from all major sell-thru and rental market segments for the company's DVD and Blu-Ray release of "Hounddog," starring Dakota Fanning, Robin Wright-Penn and David Morse. The high profile film will be released on February 3rd to the video market by wholly owned subsidiariesEmpire Home Entertainment and Hannover House, with a suggested retail of $19.95 for DVDs and $24.95 for Blu-Ray format units.

Video pre-orders from major retail accounts have already doubled the company's initial shipment forecasts, and indicate a strong commercial appeal for the film.

"This is the proverbial 'wait until DVD' title," said Eric Parkinson, CEO of Distribution for Empire. "We heavily promoted the film's theatrical release, and there was already tremendous awareness for the title from its premiere at the Sundance Film Festival and massive national publicity. Now that it's being released to DVD and Blu-Ray, the film is finally positioned to reach the large audience it deserves."

The film was released theatrically in New York, Los Angeles and Chicago commencing September 19th and played in 22 additional markets over a 13-week theatrical engagement. Key national film critics were unanimous in their praise for the performance of then 12-year-old Dakota Fanning, and the film was included in the New York Observer's list of top movies for 2008, as announced today.

"'Hounddog' was the highest profile, most talked-about independent film release of 2008," said Dean Hamilton-Bornstein, CEO of Empire Film Group, Inc. "We are pleased that the retail marketplace is strongly supporting the DVD and Blu-Ray release, and that millions of people will have the opportunity to see this important film."

"Hounddog" was written and directed by Deborah Kampmeier, and produced by Kampmeier, Jen Gatien and Scott Franklin, who also produced the acclaimed independent release, "The Wrestler," starring Mickey Rourke. It is the first of six high-profile releases from Empire Film Group, Inc., an emerging new independent producer and distributor for the USA market.

NEW RELEASE LISTING INFORMATION

    HOUNDDOG, 2008 Theatrical Release, 99 Minutes, Color, Stereo (5.1),
    WS format (1:1.85), Rated R.

    DVD Item HH 1215, UPC 7-61450-12153-9, $19.95 sugg. retail.

    BLU-RAY Item HH 0215, UPC 7-61450-02153-2, $24.95 sugg. retail.

    USA Street Date:  February 3, 2009

For more information on HOUNDDOG, including poster art, trailer and downloadable items, visit:www.HoundDogMovie.com.

Learn more about Empire Film Group at www.empirefilmgroup.com

2

P-0147

CONTACT:   Empire Film Group
           Jim Townsend
           310-317-4456
           JTownsend@EmpireFilmGroup.com
evan kaye
goldenventures llc

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone at 9176120957 and immediately delete this message and all of its attachments. Thank you.

P-0148

# EXHIBIT 7

# MEMORANDUM

Oct. 26, 2009

TO:          DEBORAH KAMPMEIER

FROM:        ERIC PARKINSON

**RE:          HOUNDDOG – BLU-RAY VIP ADVANCE SAMPLES**

Deborah – Enclosed are courtesy copies of the HOUNDDOG BLU-RAY format
units, provided to you as a professional courtesy.

Despite the horrific initial results of the film's release – from the theatrical
sabotage to the video hiccups (and lost orders) – I do believe that the film will
eventually hit a good sales level as the quality overcomes the ignorance with time.
You did a splendid job as director and creative force and I hope that you find the
opportunity to make other films in the near future as your talent becomes more
widely recognized.

Best Regards,

ERIC PARKINSON
Empire Home Ent. / Hannover House
818-481-5277  //  479-751-4500

046

Title:          HOUNDDOG

Stars:          Dakota Fanning, Robin Wright-Penn, David Morse, Piper Laurie

Director:       Deborah Kampmeier

Studio:         Empire Film Group, Inc.

Date:           July 18, 2008

Approx. Print Count:  Four Hundred (400) in the top 30+ markets

Title Specs:    93 mins., Color, Stereo, Not Yet Rated (anticipate PG-13).  1:185 prints
                and digital format (for selected locations)

Contact:        Eric Parkinson, CEO-Distribution, Empire Film Group, Inc.;  Tel. 818-
481-5277, email:  HannoverHouse@aol.com

Websites:       www.HounddogTheMovie.com  (official film site)
                www.EmpireFilmGroup.com  (studio site)

047

# EXHIBIT 8

# HOUNDDOG

*Sheet 1*

**MPRG / FULL MOON & HOUNDDOG, LLC ROYALTY REPORT**
*All Media — Inception of Release to Sept. 30, 2009*

| REVENUES | Current Actual Position | | Accrued Position |
|---|---|---|---|
| Gross Theatrical Receipts | $13,319.64 | See Detail - Worksheet 2 | $13,319.64 |
| Gross Video Receipts | $425,521.50 | See Detail - Worksheet 2 | $425,521.50 |
| Gross TV / VOD Receipts | $0.00 | See Detail - Worksheet 2 | $0.00 |
| **TOTAL RECEIVED** | **$438,841.14** | | |
| Open AR - Theatrical | $5,000.00 | Estimate of Settlements TBD | $5,000.00 |
| Open AR - Video | $23,455.48 | Current Outstanding Sales | $23,455.48 |
| Open AR - Video | $62,850.00 | Vivendi Canada Direct Assign | $62,850.00 |
| Open AR - TV & VOD | $150,000.00 | Deals still active / not cancelled | $150,000.00 |
| **GROSS ACTUAL + A.R.** | **$680,146.62** | | |

## EXPENSES

| | | | |
|---|---|---|---|
| Total Of P&A & Costs | ($888,742.18) | See Detail - Worksheet 3 | ($888,742.18) |

| ROYALTY BALANCE | Current Actual Position | | Accrued Position |
|---|---|---|---|
| Gross Collected Receipts | $438,841.14 | See Above | $680,146.62 |
| Less Empire Applicable Fee | ($109,710.29) | Per Distribution Agreement | ($170,036.66) |
| Less Recoupment of Costs | ($888,742.18) | See Detail - Worksheet 3 | ($888,742.18) |
| Less Producer Pmnts & Crd | ($1,013,499.00) | See Detail - Worksheet 4 | ($1,013,499.00) |
| **OVERAGE POSITION** | **($1,573,110.33)** | | **($1,392,131.22)** |

Oct 12 09 02:26p                                                                p.3

# HOUNDDOG

*Empire Sales Ledger*                                               *Sheet 2*

## THEATRICAL

| Settlement Date | Settlement Amount | Theatre or Circuit |
|---|---|---|
| 10/7/2008 | 5283.75 | DJT Cinemas |
| 10/29/2008 | S1,741.59 | Malco Theatres |
| 11/24/2008 | S2,245.95 | Laemmle Theatres |
| 12/6/2008 | S3,284.69 | AMC Theatres |
| 12/20/2008 | S4,083.22 | Cinema Village NYC |
| 1/22/2009 | S1,680.44 | Gaslamp 15 San Diego |
| Unpaid | $0.00 | Ritz Theater Philadelphia |
| Unpaid | $0.00 | Ritz Theater San Francisco |
| Unpaid | $0.00 | Charles Theatre Baltimore |
| Unpaid | $0.00 | Fort Myers Beach Theatre |

$13,319.64

## DVD / BLU-RAY

| Units | Gross | Description |
|---|---|---|
| 45,852 | $367,652.94 | DVD - Wholesale Revenues |
| 19,000 | S81,324.00 | DVD - Revenue Share (HW-MG) |
| 11,450 | S62,850.00 | DVD - Canadian (Vivendi report) |
| 4,980 | S44,720.00 | DVD - Cancelled Amazon.com |
| 1,500 | S16,500.00 | Blu-Ray - Cancelled Netflix order |
| 1,606 | $19,002.88 | Blu-Ray - Other cancelled orders |
| 26,600 | $221,100.00 | Wal-Mart - Cancelled order |

110,988      $813,149.82

## TELEVISION & V.O.D.

| | | |
|---|---|---|
| Unpaid | $40,000.00 | Starz / Showtime Gross License |
| Unpaid | $40,000.00 | Cancelled - Netflix V.O.D. License |
| Unpaid | $80,000.00 | Video On Demand (estimate) |
| Unpaid | $30,000.00 | Canadian TV CBC (estimate) |

$190,000.00

| TOTAL OF ALL MEDIA | $1,016,469.46 |
|---|---|

Oct 12 09 02:26p

# HOUNDDOG

**Marketing & Release Expense Summary**

*Sheet 3*

| PAYEE | AMOUNT | CATEGORY |
|---|---|---|
| Time Warner Cable | $50,000.00 | Ads. Cable TV Ads, NY, LA & Chicago |
| Variety (Ads) | $9,673.00 | Ads. Film Ads to industry |
| Memphis Spot TV | $2,000.00 | Ads. Memphis Spot TV Ads |
| Allied Ads | $14,745.00 | Ads. Newspapers |
| Clear Channel | $2,872.00 | Ads. Radio Commercials / NW Arkansas |
| Cox | $8,800.00 | Ads. Spot TV Ads in NW Ark & other mkts |
| Comcast | $5,000.00 | Ads. Spot TV Ads, Chicago |
| Gillespie | $153,880.00 | Ads. Theatrical Advertising |
| Hollywood Reporter | $40,667.00 | Ads. Various Ads including Awards Consid. |
| Film Journal | $850.00 | Ads. Web banners to promote bookings |
| Natl Promotions WP | $27,026.00 | Ads. Wildposting in Key Market |
| Cinema Village | $2,000.00 | B.O. Prepaid Ticket Purchase Promotion |
| Malco Theatres | $2,800.00 | B.O. Prepaid Ticket Purchase Promotion |
| Gaslamp Theater | $750.00 | B.O. Prepaid Ticket Purchase Promotion |
| Ritz Theater Philadelphia | $3,000.00 | B.O. Prepaid Ticket Purchase Promotion |
| Charles Theater Baltimor | $1,000.00 | B.O. Prepaid Ticket Purchase Promotion |
| AMC New York | $2,500.00 | B.O. Prepaid Ticket Purchase Promotion |
| AMC Piper's Alley | $1,000.00 | B.O. Prepaid Ticket Purchase Promotion |
| Wells Fargo Interest | $3,750.00 | Fin. Bank Letter of Credit origination fee |
| P&A Interest 1 | $23,692.01 | Fin. Interest for P&A funding |
| P&A Interest 2 | $60,000.00 | Fin. Placement Fee for P&A funding |
| Add Freight Estimate | $1,250.00 | Frt. Various / to be applied from back-up |
| Fed Ex | $2,418.43 | Frt. Various Fed Ex Costs Summary |
| Messenger Services | $1,192.84 | Frt. Various per details |
| Postmaster | $228.90 | Frt. Various Postage |
| Best Buy (Hard Drives) | $327.73 | Mkt. "Making Of" Featurette |
| Double Wide Media | $920.00 | Mkt. "Making Of" videotaping costs |
| Alder Lakish | $620.00 | Mkt. "Making Of" videotaping costs |
| Chef and CO | $4,725.15 | Mkt. Catering for Premiere after party |
| VSDA Travel Total | $3,108.45 | Mkt. Costs for DVD Presentation Show |
| McCallum | $10,875.00 | Mkt. Design, Editing & Layout various jobs |
| TEDS | $3,410.00 | Mkt. EPK Mastering & dubs for Media |
| Rentrak | $2,000.00 | Mkt. Film Tracking / Box Office Reporting |
| Roark Flyers | $800.75 | Mkt. Initial Solitication Flyer |
| J Silva | $320.00 | Mkt. Make-Up Costs for "Making of" shoot |
| Big Picture Group | $60,000.00 | Mkt. Producer's Designee for creative elements |
| Quality Sign | $985.00 | Mkt. Sunset 5 Los Angeles signage |
| FilmWorks | $25,000.00 | Mkt. Theatrical Booking & DVD Marketing |
| Roark posters | $1,467.55 | Mkt. Theatrical Posters Version 1 |
| Roark posters | $3,689.84 | Mkt. Theatrical Posters Version 2 |
| PR / Sales Meals & Ent. | $2,201.48 | Mkt. Total of key VIP meeting entertainment |
| Greg Leding PR | $4,200.00 | Mkt. Web research, PR & Initial Site Const. |
| Creative Consult | $17,500.00 | P.R. Deborah Kampmeier total payments |
| Stili PR | $2,500.00 | P.R. Field PR Services |
| Brendy Barr | $865.00 | P.R. Field Publicist |
| Lincoln Center | $2,750.00 | P.R. Film Screening Event rental |

*HOUNDDOG -- RELEASING COSTS SUMMARY -- Page Two*

| | | |
|---|---|---|
| Special Ops | $15,000.00 | P.R. Internet Promotions. Viral, Blogs, etc. |
| Elite Transportation | $6,500.00 | P.R. Limousine services premiere & talent |
| International Film Cir | $20,000.00 | P.R. Payment to Producer's Designee |
| Other Field Publicists total | $14,500.00 | P.R. Payments via IFC from Empire Advance |
| Fanning Makeup | $2,700.00 | P.R. Premiere Appearance Cost |
| Fanning Hair | $1,500.00 | P.R. Premiere Appearance Cost |
| Noble Security | $3,108.59 | P.R. Premiere Party / Event Security |
| Village East | $3,550.00 | P.R. Premiere Screening location rental |
| Kinkos Posters | $1,656.94 | P.R. Premiere signage & other Kinkos costs |
| Falco Ink | $21,000.00 | P.R. Primary National & NY P.R. |
| M Silverstein | $10,000.00 | P.R. Specialty (women's) PR Consultation |
| Wright-Penn Travel | $5,449.00 | P.R. Specifically 1st class SFO-LGA airfare |
| Addl. Premiere Trvl | $8,655.71 | P.R. Talent Flights, Hotels, Per Diems, Etc |
| Fanning Travel | $12,005.22 | P.R. Total for Fanning & Entourage (air & hotel) |
| Yellow Cab | $113.82 | P.R. Various NYC Travel |
| Travel | $22,819.54 | P.R. Various Premiere, Post & Sales Summ. |
| MPAA | $2,500.00 | Prod. CARA Film Rating Cost |
| Vicap | $572.95 | Prod. Closed Captioning Costs |
| Closed Caption | $742.50 | Prod. Closed Captioning Costs |
| Film Technik | $250.00 | Prod. Film Mastering element |
| Mango Sound | $921.19 | Prod. Film Mastering element |
| Technicolor | $36,250.00 | Prod. Film Output, Release Prints & Freight |
| Deluxe | $6,950.00 | Prod. Film Trailer Up Res |
| Ascent Media | $3,600.00 | Prod. Producer's Post-Production Obligation |
| Dolby Labs | $9,826.00 | Prod. Producer's Post-Production Obligation |
| ShoWest Confab | $1,825.00 | Registration, airfare & all costs for announcement |
| Encore | $20,715.74 | Vid. DVD & Blu-Ray Authoring / Mastering |
| CH Robinson | $248.78 | Vid. DVD Freight |
| Jerry Smallwood | $10,093.36 | Vid. DVD Placement & PR Consultation |
| Digital Works | $55,317.00 | Vid. DVD Replication |
| Advanced Digital | $5,360.00 | Vid. DVD Replication |
| ABF | $3,628.80 | Vid. Outbound DVD Freight |
| L & M Optical | $778.18 | Vid. Theatrical bookers screener discs |
| HMExpo | $3,950.00 | Vid. Video Conference Promotion |
| Home Media | $4,100.00 | Vid. Video Marketing Ad |
| Freeman Rental | $500.00 | Vid. VSDA Display Costs |
| FotoKem | $2,690.73 | VOD VOD Mastering |

$888,742.18

P-0179

# HOUNDDOG

*Sheet 4*

## Producer Royalty Payments & Credits
*(Paid to Lichter, Principals or to vendors on producer's behalf)*

*(Also Details Orders Cancelled by Producer's Actions
Which proceeds were to be paid to Producers)*

| Description | Amount |
|---|---|
| Total Payments Made & Accepted into Lichter Clien: Trust Account | $600,000 |
| Post-Production Color Correction – Ascent Media | $3,600 |
| Post-Production Dolby License Delivery Requirement | $9,826 |
| Direct assignment of Canadian DVD | $62,850 |
| Cherry Lane Music Licenses | $212,000 |
| Elvis Presley Estate License | $5,000 |
| Cancellation of Netflix V.O.D. Deal | $40,000 |
| Cancellation of Amazon shipment | $44,720 |
| Cancellation of Blu-Ray Orders | $35,503 |

**$1,013,499**

| PAYMENTS TO HOUNDDOG PRINCIPAL | |
|---|---|
| Empire Payments to Deborah Kampmeier (Creative Consultants) | $10,000 |
| IFC Payments to Kampmeier (Creative Consultants) from Empire P&A | $7,500 |

**$17,500**